## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| ARUBA PETROLEUM, INC., | § | Case No. 16-42121-11 |
| | § | Chapter 11 |
| Debtor. | § | |

### PRELIMINARY OBJECTION TO DEBTOR'S EMERGENCY MOTION TO COMPEL PAYMENT BY NEXTERA ENERGY GAS PRODUCING, LLC, NEXTERA ENERGY PRODUCER SERVICES, LLC, BSGA GAS PRODUCING, LLC AND USG PROPERTIES BARNETT II, LLC

NextEra Energy Gas Producing, LLC, NextEra Energy Producer Services, LLC, BSGA Gas Producing, LLC and USG Properties Barnett II, LLC (collectively, "NextEra"), for their Preliminary Objection to Debtor's Emergency Motion to Compel Payment [Docket No. 20] (the "Motion"), respectfully represents:

### BRIEF INTRODUCTION AND BACKGROUND

NextEra is perhaps the party in interest with the largest stake in this case: NextEra holds in excess of 95% of the working interests in the vast majority of each of the Debtors' 250 oil and gas wells. Pursuant to that certain Base Contract for Purchase and Sale of Natural Gas between Upham Oil & Gas Company and Texas Energy Management Corporation, dated April 1, 2005, as amended (the "Marketing Agreement"), which was assigned to NextEra on or about June 28, 2012 (the "Assignment"), NextEra is also responsible for marketing and selling the hydrocarbons produced from the Debtor's wells, collecting the revenues and then distributing the same among the Debtor and its various mineral interest holders. Copies of the Marketing Agreement and the Assignment are attached hereto as Exhibits A and B, respectively.

It is, therefore, highly disturbing that the Debtor did not provide NextEra with either actual notice of this chapter 11 case, any of the pleadings file to date or the Motion or the

**NEXTERA'S PRELIMINARY OBJECTION TO MOTION TO COMPEL PAYMENT – Page 1**

emergency hearing thereon; instead, NextEra found out about today's hearing from counsel to TEM (defined below) at the end of the day yesterday.  It would appear that the Debtor has purposely omitted NextEra – and perhaps other parties – as a means to exclude (or to attempt to exclude) such parties from participating in this case.

Indeed, even a brief review of the Debtor's schedules and statement of financial affairs – which are woefully deficient – reveals that the Debtor has not listed, among other things: (i) the Marketing Agreement, any of its joint operating agreements or any other agreements in schedule G, (ii) any of its working interest or other mineral interest holders, (iii) the actual leases to which it is a party either in Schedule A or Schedule G, or (iv) the names and locations of its 250 wells. In addition, the Debtor has listed mostly, if not entirely, insiders in its list of 20 largest unsecured creditors.

NextEra believes this chapter 11 case has been filed in bad faith, as a means to stop NextEra from ousting and replacing the Debtor as the operator of its wells.  These issues, and others, will be raised at the 341 meeting scheduled for tomorrow, and thereafter in appropriate pleadings filed with the Court, and NextEra intends to promptly take appropriate discovery.  In the meantime, NextEra objects to the Motion and requests that the Court either (i) deny the Motion outright or (ii) re-set the Motion for a final hearing on the merits either before the Christmas holiday or after January 9, 2017, so that document discovery and depositions may take place in the intervening period.  In the interim, the target of the Motion – Texas Energy Management – will surely hold the money or deposit it with the Court's registry.

**NEXTERA'S PRELIMINARY OBJECTION TO MOTION TO COMPEL PAYMENT – Page 2**

## **OBJECTION**

NextEra objects to the Motion on the basis that, contrary to the representations in the Motion, the Debtor is *not* entitled to receive production payments.[1]  Further, the Debtor contends that it is has in excess of $700,000 cash in the bank (Schedule A/B Part 1) and that it is holding in excess of $4 million in a "suspense account" (SOFA Part 11).   It is unclear whether the Debtor's cash in the bank is in fact the Debtor's cash, or whether some or all of that cash constitutes production revenues that are owing to third party mineral interest holders or payments made by other working interest owners, including NextEra, for the work performed by third-party vendors.

Further, the Debtor has no right to sums alleged to be held, and unpaid, by TEM.  As the holder of a working interest, the Debtor is only entitled to a portion of the net revenues, after payment of other "senior" interest holders (such as royalty interests and ORRIs) and the costs and expenses of production.

**WHEREFORE**, NextEra respectfully requests that the Court enter an order (i) denying the Motion or, in the alternative, (ii) re-setting the Motion at the Court's convenience between now and Christmas or after January 8, 2017, for a full hearing on the merits and so that discovery may be conducted in the interim period, and (iii) granting such other and further relief as may be just and proper.

---

[1] Attached to the Motion was a letter from Ben Archibald at TEM to Keith Bradley, informing Mr. Bradley that the party authorized to receive payments for hydrocarbon sales is BSGA Producing LLC.  The correct name of that entity is BSGA Gas Producing, LLC, a NextEra affiliate and one of the objectors herein.

**NEXTERA'S PRELIMINARY OBJECTION TO MOTION TO COMPEL PAYMENT – Page 3**

Respectfully submitted this 15th day of December, 2016.

**GRAY REED & McGRAW, P.C.**

By: */s/ Jason S. Brookner*
    Jason S. Brookner
    Texas Bar No. 24033684
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:   (214) 954-4135
Facsimile:   (214) 953-1332
Email:     jbrookner@grayreed.com

**COUNSEL TO NEXTERA ENERGY GAS PRODUCING, LLC, NEXTERA ENERGY PRODUCER SERVICES, LLC, BSGA GAS PRODUCING, LLC and USG PROPERTIES BARNETT II, LLC**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 15th day of December, 2016, he caused a true and correct copy of the foregoing pleading to be served via the Court's electronic case filing system (ECF) on all parties to this proceeding who have so-subscribed, and further that he caused a copy of the same to be served on counsel to the Debtor via email as follows: eric@ealpc.com.

*/s/ Jason S. Brookner*
Jason S. Brookner

**NEXTERA'S PRELIMINARY OBJECTION TO MOTION TO COMPEL PAYMENT – Page 4**

# EXHIBIT A

SCANNED

JAN 1 7 2008

# BASE CONTRACT
# FOR PURCHASE AND SALE OF NATURAL GAS

between

## UPHAM OIL & GAS COMPANY

*("Seller")*

and

## TEXAS ENERGY MANAGEMENT CORPORATION

*("Buyer")*

**dated April 1, 2005**

# GAS PURCHASE AND SALES AGREEMENT

This Base Contract for Purchase and Sale of Natural Gas ("Base Contract") is made and entered into as of the 1st day of April, 2005, by and between **Upham Oil & Gas Company**, a Texas corporation, (*"Seller"*) and **Texas Energy Management Corporation**, a Texas corporation (*"Buyer"*).

## WITNESSETH:

WHEREAS, Seller owns or controls certain natural Gas production from Properties in which it owns and/or controls an interest;

WHEREAS, Seller may have available for sale volumes of said Gas production; and

WHEREAS, Buyer may have markets for and may desire to purchase such Gas subject to the provisions of this Base Contract.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, Seller and Buyer do hereby covenant and agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     *"Exhibit 'A' "* refers to the document(s) attached hereto which may list the properties and their location, the Point(s) of Delivery, the Transaction Confirmation, and the Transporter(s) for the available Gas which Buyer intends to purchase.  Such documents attached hereto shall be considered a part hereof subject to the terms and conditions hereunder and shall be incorporated by reference herein.

1.2     *"Contract Quantity"* means that volume of Gas specified in the Transaction Confirmation.

1.3     *"Delivery Period"* means the period of time during which deliveries of Gas are to be made as set forth in the Transaction Confirmation.

1.4     *"Firm"* means that either party may interrupt its performance without liability only to the extent that such performance is prevented by reason of Force Majeure; provided, however, that during any Force Majeure interruption, the party invoking Force Majeure shall be responsible for any Imbalance Charges as provided in Sections 6.3 and 7.2 related to its interruption after the nomination is made to the Transporter and until the change in deliveries and/or receipts is confirmed by the Transporter.

1.5     *"Gas"* means natural Gas produced from Gas wells, Gas produced in association with oil, and/or Gas remaining after processing.

1.6     *"Imbalance Charges"* means any fees, penalties, costs or charges (in cash or in kind) assessed either (i) by a Transporter for failure to satisfy the Transporter's balance and/or nomination requirements or (ii) by a resale market for delivery of more or less than the Contract Quantity scheduled in a particular Transaction Confirmation.

1.7     *"Interruptible"* means that either party may interrupt its performance at any time for any reason, whether or not caused by an event of Force Majeure, with no liability, except such interrupting party shall be responsible for any Imbalance Charges as set forth in Section 7.2 below related to such interruption after the nomination is made to the Transporter and until the change in deliveries and/or receipts is confirmed by Transporter.

1.8     *"Month"* means the period beginning on the first day of the calendar month and ending immediately prior to the commencement of the first day of the next calendar month.

Copyright © 1996 Gas Industry Standards Board, Inc.
All rights reserved.

GISB Standard 6.3.1
May 13, 1996

1.9      *"MMBtu"* means one million British thermal units.

1.10      *"Party"* or *"Parties"* means Seller, Buyer and any person or entity claiming by or under them, or also owning an interest in the Properties.

1.11      *"Point(s) of Delivery"* and/or *"Delivery Points"* both mean the Delivery Point(s) mutually agreed upon between Seller and Buyer as set forth in the Transaction Confirmation.

1.12      *"Properties"* means the lands covered by the oil, gas and mineral leases owned by Seller in various counties in Texas, as described in Exhibit "A", and includes all of Seller's leases now or later dedicated to this Base Contract.

1.13      *"Resale Contract(s)"* means the Gas sales contract(s) which Buyer, in its sole discretion, may enter into from time to time with customers for the purposes of reselling the Gas purchased pursuant to this Base Contract and that have among the Point(s) of Delivery thereunder the same point(s) as the Point(s) of Delivery hereunder.

1.14      *"Scheduled Gas"* means the quantity of Gas confirmed by Transporter(s) for movement, transportation or management.

1.15      *"Transaction Confirmation"* means a document substantially in the form of Exhibit "A" containing the terms of a purchase and sale transaction between Buyer and Seller for a Delivery Period.

1.16      *"Transporter"* means all Gas gathering or pipeline companies, or local distribution companies, acting in the capacity of a transporter, transporting Gas for Seller or Buyer upstream or downstream, respectively, from the Delivery Point pursuant to a particular Transaction Confirmation

## ARTICLE II
## PRICE

2.1      The price to be paid by Buyer to Seller for all quantities of Gas to be purchased and paid for in accordance with the provisions hereof shall be equal to **ninety-eight percent (98%)** of the price(s) stipulated in Buyer's resale contract(s). The price to be paid Seller by Buyer hereunder shall be inclusive of all production-related taxes and royalties. Notwithstanding the above, any third-party fees, expenses or charges of any kind applicable to Gas purchased hereunder, including, but not limited to, transportation fees, gathering fees, processing charges, compression costs, dehydration expenses, Imbalance Charges, fuel costs, line losses, or any other charges or costs shall be deducted from the percentage of proceeds to be paid by Buyer to Seller. It is understood and agreed that, after making payment to Seller as provided herein, Buyer shall retain and own the remaining portion of resale proceeds applicable to Gas purchased hereunder.

## ARTICLE III
## DEDICATION

3.1      Seller covenants and represents that Seller owns an interest or interests in the Properties which are more particularly described in Exhibit "A" attached hereto and made a part hereof. Seller commits and dedicates to this Base Contract all of Seller's Gas (i) produced from the Properties described in Exhibit "A", and (ii) delivered at the Point(s) of Delivery hereunder. Seller represents and warrants that it owns or controls, and/or has the right to dedicate to the terms and provisions hereof, one hundred percent (100%) interest in all Gas delivered to the Point(s) of Delivery. Seller hereby grants to Buyer the sole and exclusive right to purchase all such Gas during the term hereof. . Either Party may, from time to time, file for record a memorandum of this Base Contract which shall set forth the name of the Parties, the Properties subject to this Base Contract, and the term of this Base Contract.

Copyright © 1996 Gas Industry Standards Board, Inc.
All rights reserved.

GISB Standard 6.3.1
May 13, 1996

## ARTICLE IV
## TERM

4.1     This Base Contract shall be effective from the date first above written and shall continue thereafter for a period of ten (10) years from the first day of the first full month in which deliveries commence hereunder. Thereafter, this Base Contract automatically shall continue month-to-month until cancelled by either party upon giving written notice to the other party at least sixty (60) days prior to the next ensuing anniversary date.

## ARTICLE V
## QUALITY, PRESSURE, AND MEASUREMENT

5.1     All Gas shall be of merchantable quality and shall meet the quality specifications of the Transporter. Seller shall deliver or cause to be delivered the Gas at the Point(s) of Delivery at a pressure sufficient to enter the facilities of Transporter. If the Transporter refuses to accept delivery of Seller's Gas at the Point(s) of Delivery for failure of Seller's Gas to conform to Transporter's quality standards, Buyer shall not be obligated to purchase such Gas. The Transporter's definitions, specifications, procedures, terms and provisions relating to the receipt of Gas hereunder are hereby expressly incorporated herein by reference.

5.2     For payment and other purposes hereunder, both parties agree to rely on the information provided by the Transporter as to the quantity of Gas measured at the Point(s) of Delivery, provided that the British thermal unit content per cubic foot shall be determined for a cubic foot of Gas in the same manner as specified in the Resale Contract(s). Both Seller and Buyer shall have the right to dispute the accuracy of the information provided by the Transporter, and in the event a dispute does arise, both parties agree to work together in good faith to resolve such dispute. Buyer shall have no liability for any inaccuracy with respect to information provided by the Transporter.

5.3     In the event there is more than one party making a sale at the Point(s) of Delivery, then Seller agrees to provide or cause to be provided to Buyer an allocation statement setting out the volumes of all parties making sales at the Point(s) of Delivery. Seller shall provide or cause to be provided to Buyer such allocation statement along with any other supporting documentation as may be reasonably necessary to enable Buyer to make payment to Seller or to collect payment from Buyer's customers under the Resale Contract(s).

## ARTICLE VI
## QUANTITY

6.1     The amount of Gas which Buyer will receive and purchase from Seller hereunder will depend upon the amount of such Gas which is both received by Transporter and purchased by Buyer's resale market. If Transporter refuses to accept delivery of any quantities of Gas which Seller has available otherwise at the Point(s) of Delivery, Buyer shall not be obligated to purchase such refused quantities. In no event shall Buyer be obligated to purchase any quantities of Seller's Gas which have not been received and purchased by Buyer's resale market.

## ARTICLE VII
## PAYMENT

7.1     Buyer shall make payment to Seller on or before ten (10) business days after Buyer has received both (i) payment for Gas volumes resold by Buyer and (ii) information from the Transporter which confirms volumes actually delivered at the Point(s) of Delivery in accordance with the terms and provisions of this Base Contract. Buyer shall not be obligated to make payment for any Gas volumes for which Buyer has not collected payment for the resale thereof. Buyer and Seller agree to work together

Copyright © 1996 Gas Industry Standards Board, Inc.
All rights reserved.

GISB Standard 6.3.1
May 13, 1996

to obtain pipeline statements or other documentation to facilitate timely payment.

7.2     Seller shall be responsible for payment of and shall reimburse Buyer for any Imbalance Charges incurred with respect to Seller's Gas except those which are incurred as a result of error or negligence of Buyer.  In the event that Buyer and Seller are each required to pay an amount under the terms of this Agreement in the same Month, then such amounts, with respect to each Party, will be aggregated, and the parties will discharge their respective obligations though offset and the party which owes the greater aggregate amount will pay to the other party the difference between the amounts owed.

7.3     If either party has a bona fide question regarding the accuracy of any payment, statement, charge or computation made pursuant to this Base Contract, such party shall notify the other party in writing, furnishing full particulars supporting the validity of such question(s).  Thereafter, the parties shall arrange a mutually agreeable time for the questioning party to examine that portion of the records of the other party which is reasonably necessary to verify the accuracy of the payment, statement, charge or computation in question.  The records examination by the questioning party shall not include issues or matters not raised, information deemed to be confidential by the owner of the records, or proprietary information pertaining to third parties.  In the event the examination reveals any error in any payment, statement, charge or computation rendered hereunder, such error shall be adjusted and payment made promptly by the party liable therefor.  Any party receiving proceeds under this Base Contract may not claim any adjustment or correction of any payment, statement, charge or computation unless written notice of such claim is furnished to the other Party within one (1) year after the end of the Month for which such adjustment or correction is claimed.

## ARTICLE VIII
## DELIVERY POINTS

8.1     Gas sold and delivered hereunder shall be delivered at the Point(s) of Delivery set forth in the Transaction Confirmation between Seller and Buyer.  Seller shall be prepared to nominate and deliver, and Buyer shall be prepared to accept, Gas at the Point(s) of Delivery as soon as practical following execution of this Base Contract.  Title to the Gas purchased by Buyer shall pass from Seller to Buyer at the Point(s) of Delivery unless the Transporter will not accept delivery of such Gas.

## ARTICLE IX
## TRANSPORTATION

9.1     All sales and purchases of Gas hereunder shall be subject to the arrangement and maintenance of any necessary Gas transportation and Gas processing, and to the availability of transportation capacity with any Transporter transporting the Gas subject to this Base Contract.

## ARTICLE X
## WARRANTY

10.1     Seller warrants for itself, its heirs, successors and assigns, that it has good and lawful title and/or the legal right to sell all Gas sold hereunder, and that such Gas is free from liens and adverse claims of every kind.  As to Gas not owned by Seller which Seller warrants the right to market, Seller warrants it has the right and authority to act on behalf of the parties owning such Gas with respect to all matters covered by this Base Contract.  Seller shall at all times have the obligation to make or cause to be made settlements for all royalties and production taxes due, and to make or cause to be made settlements with all other persons having any interest in the Gas sold hereunder.  Seller hereby indemnifies Buyer and holds Buyer harmless from all suits, causes of action, debts, accounts, damages, costs, including attorney's fees, losses and expenses arising out of or relating to adverse claims of any kind from any and all persons, firms, or corporations related to the Gas sold hereunder or payments therefore which are applicable before the title passes to Buyer.  Buyer may, upon learning of any adverse claim, retain as security the entire purchase price of the Gas, without interest, until Buyer has

Copyright © 1996 Gas Industry Standards Board, Inc.
All rights reserved.

GISB Standard 6.3.1
May 13, 1996

been satisfied as to the amount of such claim or ownership claimed, until such claim has been finally determined and satisfied or until Seller shall have furnished bond to Buyer in an amount and with surety satisfactory to Buyer and conditioned to hold Buyer harmless. Furthermore, Seller, upon request from Buyer, shall execute a 100% indemnifying Gas Division Order prior to Buyer releasing any payments hereunder.

### ARTICLE XI
### FORCE MAJEURE

11.1     Except with regard to Seller's obligation to make payments for Imbalance Charges neither party shall be liable to the other for failure to perform a Firm obligation, to the extent such failure was caused by Force Majeure. The term "Force Majeure" as employed herein means any cause not reasonably within the control of the party claiming suspension, as further described in Section 11.2.

11.2     The term "Force Majeure" shall include but not be limited to the following: (i) physical events such as acts of God, landslides, lightning, earthquakes, fires, storms or storm warnings, such as hurricanes, which result in the evacuation of the affected area, floods, washouts, explosions, breakage or accident or necessity of repairs to machinery or equipment or lines of pipe, as long as such breakage or accident or necessity of repairs is not caused by the negligence or neglect of the claiming party; (ii) weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe; (iii) interruption of firm transportation and/or storage by any Transporter; (iv) acts of others such as strikes, lockouts or other industrial disturbances, riots, sabotage, insurrections or wars; and (v) governmental actions such as necessity for compliance with any court order, law, statute, ordinance, or regulations promulgated by a governmental authority having jurisdiction.

11.3     Notwithstanding the foregoing, neither party shall be entitled to the benefit of the provisions of Force Majeure to the extent performance is affected by any or all of the following circumstances: (i) the curtailment of interruptible or secondary firm transportation unless primary, in-path, Firm transportation is also curtailed; (ii) the party claiming excuse failed to remedy the condition and to resume the performance of any covenants or obligations with reasonable dispatch; or (iii) economic hardship. In no event shall the party claiming Force Majeure be excused from its responsibility for Imbalance Charges.

### ARTICLE XII
### LAWS AND JURISDICTION

**12.1     THIS BASE CONTRACT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, INCLUDING WITHOUT LIMITATION, THE TEXAS UNIFORM COMMERCIAL CODE, EXCLUDING CONFLICTS OF LAW PRINCIPLES WHICH WOULD REFER TO THE LAWS OF ANOTHER JURISDICTION.. THE PARTIES HEREBY SUBMIT TO THE JURISDICTION OF THE STATE AND FEDERAL COURTS IN THE STATE OF TEXAS AND FOR VENUE IN DALLAS COUNTY, TEXAS, AND WAIVE ANY RIGHT TO WHICH THEY MAY BE ENTITLED TO SUBMIT A DISPUTE UNDER THE LAWS OR COURTS OF ANOTHER JURISDICTION.**

**12.2     UNLESS OTHERWISE PROVIDED HEREIN, NEITHER BUYER NOR SELLER SHALL BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, CONSEQUENTIAL, PUNITIVE OR SPECIAL DAMAGES ARISING OUT OF THIS BASE CONTRACT OR ANY BREACH HEREOF.**

### ARTICLE XIV
### ASSIGNMENT

13.1     This Base Contract may be assigned, in whole or in part by either party without restriction by the other party upon the following terms and conditions: (i) the assignment shall state that the assignee accepts and assumes all of the assignor's responsibilities and obligations to perform under

Copyright © 1996 Gas Industry Standards Board, Inc.
All rights reserved.

this Base Contract, (ii) the assignment shall state that it extends to and shall be binding upon the parties thereto, their heirs, administrators, assigns and successors in interest and (iii) written notice to the other party of any such assignment shall be made in writing within thirty (30) days of such assignment. No transfer of or succession to the interest of the Seller or change in interests disbursed and/or marketed by Seller hereunder shall affect or bind the Buyer until it shall have been furnished with the original instrument, or instruments, or with other proper proof satisfactory to Buyer, establishing that the claimant is legally entitled to such interest

## ARTICLE XIV
## COURSE OF DEALING

**14.1    THE PARTIES ACKNOWLEDGE THAT IN ORDER TO IMPLEMENT THE TRANSACTIONS CONTEMPLATED BY THIS BASE CONTRACT, ONE OR MORE COURSE(S) OF DEALING WILL BE ENGAGED IN, AND BUYER AND SELLER AGREE THAT SUCH COURSE(S) OF DEALING, WHEN ADOPTED BY PRACTICE, SHALL BE DEEMED TO BE INCORPORATED INTO THIS BASE CONTRACT, WHETHER OR NOT COMMITTED TO WRITING.  IN THE EVENT OF CONFLICT BETWEEN ANY COURSE OF DEALING AND ANY WRITTEN TERM OR PROVISION IN THIS BASE CONTRACT, THE COURSE OF DEALING SHALL CONTROL.**

## ARTICLE XV
## DISPUTE RESOLUTION

15.1    <u>Negotiation</u>.  In the event that any dispute arises related to the Base Contract, the Parties first shall seek to resolve any disputes by negotiation between management with authority to settle the dispute.  The management shall meet at a mutually acceptable time and place within 30 days after the receipt of notice provided in 15.1 to exchange relevant information and to attempt to resolve the dispute. All negotiations are confidential and shall be treated as compromise settlement negotiations under the United States Federal Rules of Evidence.

15.2    <u>Notification</u>.  When a Party believes there is a dispute relating to the Base Contract, the Party will give the other Party written notice of the dispute providing sufficient detail for the recipient to understand the provider's position

15.3    <u>Arbitration</u>.  If a dispute has not been resolved within 45 days after receipt of the original notice of a dispute, then either Party may provide the other Party with notice to initiate arbitration proceedings, which proceedings shall be conducted as provided herein below.

15.4    <u>Scope</u>.  Any dispute, controversy or claim of any and every kind or type, whether based on contract, tort, statute, regulations, or otherwise, arising out of, connected with, or relating in any way to the Base Contract, the relationship of the Parties, the obligations of the Parties or the transactions carried out under the Base Contract, shall be settled through final and binding arbitration, it being the intention of the Parties that this arbitration agreement encompass all possible disputes among the Parties relating to the Base Contract.

15.5    <u>Timeliness</u>.  Initiation of arbitration shall toll the running of all statutes of limitation relating to the matters in dispute.  Demand for arbitration may be made no later than the time that such action would be permitted for claims under Section 7.3 hereinabove or under the applicable statute of limitation, whichever shall be applicable to the claim in question, and if both are applicable, the earlier deadline shall control.  Any disputes regarding the timeliness of the demand for arbitration will be decided by the arbitrator(s).

15.6    <u>Institutional Arbitration</u>.  The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") as in effect on the date of

Copyright © 1996 Gas Industry Standards Board, Inc.
All rights reserved.

commencement of the arbitration proceeding, except as modified herein.

15.7     Number of Arbitrators.  If the dispute involves less than $1 million, exclusive of interest and costs, then the arbitration shall be conducted and finally settled by a sole arbitrator.  If the amount in controversy, exclusive of interest and costs, is $1 million or greater, if the amount in dispute is unknown, or if relief other than monetary damages is sought, then the arbitration shall be conducted and finally settled by three (3) arbitrators.  If the arbitration is to be conducted by a sole arbitrator, then the arbitrator will be jointly selected by the Parties.  If the Parties fail to agree on the arbitrator within 30 days after the initiation of arbitration, then the AAA shall appoint the arbitrator.  If the arbitration is to be conducted by 3 arbitrators, each Party shall within 15 days after initiation of the arbitration select one arbitrator, and these two arbitrators shall select a third presiding arbitrator.  If the two Party-appointed arbitrators fail to agree on the third arbitrator within 15 days after the appointment of the later of the two, then the third arbitrator shall be appointed by the AAA.  All arbitrators appointed by the AAA shall meet the qualifications set forth herein.

15.8     Place of Arbitration.  Unless agreed by all Parties to the arbitration, the arbitration shall be in Dallas, Texas.

15.9     Method of Selecting Arbitrators.  All arbitrators constituting the arbitral tribunal, no matter how selected, shall  have at least five (5) years of professional experience in the natural gas marketing and transportation industries, including a demonstrated understanding of natural gas purchase and sale contracts, natural gas transportation contracts, and natural gas financial derivative products.  Further, all arbitrators shall be and remain at all times wholly independent, unbiased and impartial, and shall provide the Parties with a statement that they will decide the dispute impartially.

15.10    Briefs of Positions.  No later than 15 days prior to the hearing date set by the arbitrator(s), each Party shall submit a brief detailing its factual and legal position, its recommendation for decision and disposition of the matter, including a monetary figure if applicable.

15.11    Interim Relief.  The arbitrators, or in an emergency the third arbitrator chosen acting alone in the event one or more arbitrators are unable to be involved in a timely manner, may grant interim relief, including injunctions, attachments and conservation orders in appropriate circumstances, which measures the Parties agree may be immediately enforced by the arbitrator(s) or by a court of competent jurisdiction.  Notwithstanding the requirement for negotiation, prior to the establishment of the arbitration tribunal, or in the absence of the jurisdiction of the arbitrators to rule on interim measures n a given jurisdiction, any Party may apply to a court of competent jurisdiction for interim relief, and the Parties agree that seeking and obtaining such measures shall not waive the right to arbitration.  Furthermore, notwithstanding the above provisions regarding negotiation, if either Party deems that time is of the essence in resolving the dispute, it may initiate arbitration and seek interim relief, as provided herein, and thereafter comply with the requirements for negotiations as long as they have been fully completed before the commencement of the final hearing on the merits in the arbitration proceeding.

15.12    Confidentiality.  The hearing shall be conducted on a confidential basis, and neither any Party nor the arbitrator(s) may disclose the existence, content or results of any arbitration hereunder without the prior written consent of both Parties.

15.13    Decision and Awards.  In rendering the award, the arbitrator(s) will determine the rights and obligations of the Parties according to the laws of the State of Texas, excluding any conflict of laws principles.  No punitive, penal, consequential, incidental, indirect, or special damages may be awarded or recovered.  The arbitral tribunal is authorized to award costs and attorney's fees or to allocate them between the Parties.  The costs of the arbitration proceedings, including attorney's fees, shall be borne in the manner determined by the arbitral tribunal.

Copyright © 1996 Gas Industry Standards Board, Inc.
All rights reserved.

15.14  <u>Final and Binding Decision</u>.  The decision of the arbitral tribunal shall be final and binding on the Parties and enforceable in any Texas court.  To the extent permitted by law, any right to appeal the arbitral award by any court is herby waived by the Parties.

## ARTICLE XVI
## MISCELLANEOUS

16.1      Any notice or other communication required or permitted to be given pursuant to this Base Contract shall be confirmed in writing and shall be deemed properly given when hand delivered, sent by overnight mail signed receipt requested, by facsimile with confirmed receipt, or mailed from within the United States by United States certified mail, return receipt requested, postage prepaid to the following addresses:

Seller:      <u>Notices, Correspondence, Payments and Dispatching</u>
            **Upham Oil & Gas Company**
            P.O. Box 940
            Mineral Wellsl, Texas 76068
            Telephone: (940) 325-4491      Fax: (940) 325-0108
            Attn: Chester R. Upham, Jr.

Buyer:      <u>Notices, Correspondence, Invoices and Dispatching</u>
            **Texas Energy Management Corporation**
            4925 Greenville Avenue, Suite 860
            Dallas, Texas 75206
            Phone: (214) 696-4999      Fax: (214) 696-8635
            Attn: Bill Willhoite

Either party may change its address by giving the other party written notice of such change. Scheduling and dispatching by telephone or other mutually agreeable means shall be considered as duly delivered without the necessity for subsequent written confirmation, unless requested by either party.

16.2      Seller shall be designated as Seller's Representative for all parties having an interest all Gas delivered hereunder who also sell Gas to Buyer from said properties under the terms and conditions of this Base Contract.  As Seller's Representative, Seller shall provide all information as may be reasonably necessary or required hereunder, including but not limited to, providing allocation statements and volume information for nomination purposes, and Seller shall receive all notices or invoices, as may be necessary, as well as all payments required under this Base Contract.  Buyer may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by Seller's Representative on behalf of the other parties as pertains to all matters dealt with herein the same as though each of the other parties have done or performed the same, and Buyer shall not be required to seek the application of any monies paid to Seller's Representative.  The parties may change their representative and designate one of their number as the new Seller's Representative from time to time by delivery of written notice to Buyer.

16.3      This Base Contract together with Exhibit "A" and other material incorporated herein by reference constitute the entire agreement of the parties as to the matters contained herein, and this Base Contract is performable in Dallas, Dallas County, Texas.

16.4      This Base Contract may be executed in one or more counterparts, each of which shall he deemed an original, and all of which together constitute one and the same instrument.

Copyright © 1996 Gas Industry Standards Board, Inc.
All rights reserved.

GISB Standard 6.3.1
May 13, 1996

IN WITNESS WHEREOF, the parties hereto, by their duly authorized officers or agents, have executed this Gas Purchase and Sales Base Contract in multiple originals.

**TEXAS ENERGY MANAGEMENT CORPORTION**

*"Buyer"*

By: _____
     Dennis G. Moser
     President

**UPHAM OIL & GAS COMPANY**

*"Seller"*

By: _____
     Chester R. Upham
     President

Copyright © 1996 Gas Industry Standards Board, Inc.
All rights reserved.

# EXHIBIT B

## ASSIGNMENT AND ASSUMPTION OF
## TEXAS ENERGY MANAGEMENT CONTRACT

This assignment and assumption agreement (this "Assignment") is made and entered into as of the 28th day of June, 2012 ("Assignment Effective Date"), by and between Aruba Petroleum, Inc. ("Aruba"), NextEra Energy Gas Producing, LLC ("NEGP") and NextEra Energy Producer Services, LLC ("NEPS"). Aruba, NEGP and NEPS are referred to herein collectively as the "Parties" and each individually as a "Party".

### *RECITALS:*

A.      Upham Oil and Gas Company and Texas Energy Management Corporation entered into that certain Gas Purchase and Sales Agreement dated April 1, 2005, as amended on February 1, 2008 (as amended, the "TEM Contract").

B.      On January 20, 2012, Aruba purchased from Upham Producing, L.P. ("Upham") one hundred percent (100%) of Upham's interest in certain oil and gas leases that are subject to the TEM Contract (the "Purchased Properties"). The assignment of the Purchased Properties from Upham to Aruba reflecting such transaction is attached hereto as Exhibit "A".

C.      On January 25, 2012, NEGP purchased from Aruba ninety-six and seventy-five hundredths percent (96.75%) of Aruba's interest in the Purchased Properties (such interest purchased by NEGP, the "NEGP Interest", and the 3.25% interest retained by Aruba, the "Aruba Interest"). The assignment of the NEGP Interest in the Purchased Properties from Aruba to NEGP reflecting such transaction is attached hereto as Exhibit "B".

D.      NEPS is an affiliate of NEGP. Aruba and NEGP agree that NEPS provides marketing services to NEGP and Aruba and has the authority to market hydrocarbons from the Aruba Interest and the NEGP Interest on behalf of Aruba and NEGP, respectively.

E.      Aruba and NEGP each desire to assign and release their rights and obligations as "Seller" under the TEM Contract to NEPS, and NEPS desires to obtain and assume such rights and obligations, provided that, for the avoidance of doubt, the Aruba Interest and the NEGP Interest in the Purchased Properties shall remain subject to the TEM Contract, but only to the extent set forth in the TEM Contract.

IN CONSIDERATION OF the foregoing premises, the mutual covenants and agreements herein contained and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      As of and from the Assignment Effective Date, Aruba and NEPS hereby assigns and transfers its rights and obligations as "Seller" under the TEM Contract to NEGP, and NEGP hereby assumes and agrees to fully perform and discharge all such rights and obligations.

2.     The Parties hereby recognize that the Aruba Interest and the NextEra Interest in the Purchased Properties shall remain subject to the TEM Contract, but only to the extent set forth in the TEM Contract.

3.     Notwithstanding anything contained in this Assignment, each Party's liability to the other Parties in connection with this Assignment shall be limited to direct damages and shall exclude any other liability, including without limitation liability for special, indirect, punitive or consequential damages in contract, tort, warranty, strict liability or otherwise.

4.     This Assignment shall be governed and construed in accordance with the laws of the State of Texas, without regard to principles of conflict of laws that, if applied, would require the application of laws of another jurisdiction.

5.     **TO THE EXTENT PERMITTED BY LAW, EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT EACH OF THEM MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT.   THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THIS AGREEMENT.**

6.     Each of the Parties hereby represents and warrants it has the requisite authority to enter into and execute this Assignment.

7.     This Assignment (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

[Signature Page Follows]

The Parties hereto have caused this Assignment to be executed by their respective duly authorized representatives in duplicate as of the Assignment Effective Date.

**ARUBA PETROLEUM, INC.**

By: _____

Name: ____James L. Poston____

Title: _____President_____


**NEXTERA ENERGY GAS PRODUCING, LLC**

By: _____

Name: _____

Title: _____


**NEXTERA ENERGY PRODUCER SERVICES, LLC**

By: _____

Name: _____

Title: _____

The Parties hereto have caused this Assignment to be executed by their respective duly authorized representatives in duplicate as of the Assignment Effective Date.

**ARUBA PETROLEUM, INC.**

By: _____

Name: _____

Title: _____

**NEXTERA ENERGY GAS PRODUCING, LLC**

By: *Molly Boyd*

Name: Molly Boyd

Title: VP Gas Infrastructure



**NEXTERA ENERGY PRODUCER SERVICES, LLC**

By: *Molly Boyd*

Name: Molly Boyd

Title: VP Gas Infrastructure

# EXHIBIT "A" TO ASSIGNMENT OF TEXAS ENERGY MANAGEMENT CONTRACT

## UPHAM-ARUBA ASSIGNMENT

NOTICE OF CONFIDENTIALLITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENCE NUMBER.

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF WISE | § |

### PARTIAL ASSIGNMENT OF OIL AND GAS LEASES

For a valuable consideration received, the receipt and sufficiency of which is hereby acknowledged, *Upham Producing, L.P.,* ("Assignor"), whose mailing address is, PO Box 940, Mineral Wells, Texas 76068, does hereby assign, sell and transfer to *Aruba Petroleum, Inc.* ("Assignee"), whose mailing address is 555 Republic Drive, Suite 505, Dallas, Texas 75074, all of Assignor's right, title and interest in and to the Oil and Gas Leases ("Leases") described or referred to on Exhibit "A" attached hereto, along with the non-exclusive right to utilize and occupy the surface lands that cover the Leases, including all rights of way, rights of ingress and egress, road pipeline and other easement rights, and any other rights, titles, interests, permits or privileges, that relate directly to or are used in connection with such leasehold rights, titles and interests.

Assignor excepts and reserves an overriding royalty interest equal to the difference between twenty-five percent (25.0%) and the existing burdens of record on the Leases, of all oil, gas and casinghead gas produced, saved and marketed from the allocated leased lands under the provisions of the aforesaid Leases or any extensions or renewals thereof, such overriding royalty interest being free and clear of any cost and expense of the development and operation thereof, including costs of compression, transportation, treatment and marketing, but excepting taxes applicable to said interest and production therefrom, proportionately reduced to the leases and mineral interest actually conveyed by Assignor to Assignee. It being the intent of the parties hereto that Assignee is to receive a seventy five percent (75.0%) net revenue interest in and to the Leases, except that Assignee shall receive a 0.7408982 NRI on the Whatley Lease and a 0.7109375 NRI on the Simpson and Jordan-Smith Leases.

This Assignment of Oil and Gas Leases ("Assignment") and the interest assigned and conveyed in and to the Leases is limited in depths from the top of the Barnett Shale formation to the base of the Barnett Shale formation (the "Assigned Formation").

Assignor further RESERVES AND EXCEPTS from this Assignment. (i) any formations above the top of the Barnett Shale formation and below the base of the Barnett Shale formation (the "Retained Formations"), (ii) the wells described on Exhibit "B" attached and made a part hereof (the "Retained Wells") and a twenty (20) acre tract in the form of a square surrounding each of the Retained Wells, with each such tract being positioned so that the surface location of each such Retained Well is in the center of each such tract (each, a "Retained Tract"), including the portion of such Retained Wells and Retained Tracts that are completed in the Assigned Formation and (iii) the concurrent rights in and to the Leases (including surface rights and surface easements, express or implied, granted under or pursuant to the Leases) to the extent required by Assignor to explore, develop, operate, produce and market oil, gas and hydrocarbons from the Retained Formations and the Retained Wells.

This Assignment is subject to the terms and conditions of that certain Definitive Agreement dated as of January 20, 2012 between Assignee and Upham Producing, L.P., covering the Leases. In the event of a conflict between the above-described Definitive Agreement and this Assignment, the terms of the Definitive Agreement shall prevail.

By accepting this Assignment, Assignee hereby agrees as of the date hereof, to the extent of the leasehold interest in and to the depths conveyed and assigned herein, to assume, perform and comply with all of the provisions and obligations (express or implied) that are attributable to the Leases, including, but not limited to, all of the terms and conditions of all applicable and valid agreements, contracts and instruments, lease agreements. pooling agreements, communitization agreements and easements and rights-of-way; all existing lease burdens

(including, but not limited to, royalties, overriding royalties, production payments, net profits interests, carried working interests or similar burdens); all duties imposed by governmental law, rule or regulation, including the obligations to properly and timely plug and abandon all wells hereafter drilled on the lands covered by the Leases by Assignee, its successors or assigns; to properly and timely remove all buildings, equipment and materials from the lands covered by the Leases that are placed upon the Leases by Assignee upon cessation of use thereof to the extent required by the Leases or other applicable contracts; and to properly and timely restore the surface of the lands covered by the Leases to the extent required by the Leases or other applicable contracts.

Assignor warrants title to the Leases by, through and under Assignor and its affiliates, but not otherwise. Other than the warranty set forth in the preceding sentence, this Assignment is made without warranty of title, either express or implied.

The provisions of this Assignment are for the benefit of and are binding upon Assignor, Assignee, and their respective heirs, personal representatives, successors, and assigns.

**ASSIGNOR:**

**Upham Producing, L.P.**
By:     Upham, LLC, a Texas Limited Liability Company;
        as its General Partner

        _____
        Paul McGettes, Manager

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF PALO PINTO** | § |

SWORN TO AND SUBSCRIBED before me on this the _20_ day of _JANUARY_____, 2012, by _PAUL McGETTES_____, in the capacity stated above.

_____
Notary Public, State of Texas

> ROBERT DOUGLAS FREEMAN
> My Commission Expires
> August 9, 2014

**ASSIGNEE:**
        Aruba Petroleum, Inc.

        _____
        James Poston, President

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF** _PALO PINTO_ | § |

SWORN TO AND SUBSCRIBED before me on this the _20_ day of _JANUARY_____, 2012, by _JAMES POSTON_____, in the capacity stated above.

_____
Notary Public, State of Texas

> ROBERT DOUGLAS FREEMAN
> My Commission Expires
> August 9, 2014

Exhibit "A"

**Read Unit (352 acres)**

The Read Unit in Wise County, Texas, consisting of oil and gas leases comprising 352 acres out of the Van Zandt County School Land Block, A-1182 and the C. Frazier Survey, A-297 and described in that certain Designation of Read Gas Unit dated May 18, 1955 and consisting of portions of the following six (6) leases:

1. Oil and Gas Lease from H. D. Read and wife to Upham Gas Company, dated February 9, 1955, recorded at Volume 81, Page 487, Lease Records, Wise County, Texas, said lease covering 97 acres and said Read Unit encompassing 93.2 acres of said H.D. Read lease;
2. Oil and Gas Lease from Ethel Randal Read, et al dated April 15, 1953 recorded in Volume 73, Page 213, Lease Records, Wise County, Texas, said lease covering 97 acres and said Read Unit encompassing 88.7 acres of said Ethel Randal Read lease;
3. Oil and Gas Lease from T. P. Read dated April 15, 1953 recorded in Volume 73, Page 207, Lease Records, Wise County, Texas, said lease covering 97 acres and said Read Unit encompassing 34 acres of said T. P. Read lease;
4. Oil and Gas Lease from Carl Read dated April 14, 1953 recorded in Volume 73, Page 203, Lease Records, Wise County, Texas, said lease covering 97 acres and said Read Unit encompassing 37.6 acres of said Carl Read lease;
5. Oil and Gas Lease from Sam M. Edwards dated July 6, 1953 recorded in Volume 75, Page 87, Lease Records, Wise County, Texas, said lease covering 97 acres and said Read Unit encompassing 73 acres of said Sam M. Edwards lease; and
6. Oil and Gas Lease from Ruth Cole dated April 14, 1953 recorded in Volume 73, Page 221, Lease Records, Wise County, Texas, said lease covering 97 acres and said Read Unit encompassing 25.9 acres of said Ruth Cole lease;

as well as all other leases or tracts of land encompassed in said Read Unit as to be determined by the parties upon formal surveying.

**Hudson Unit (140.8 acres)**

Hudson Unit in Wise County, Texas consisting of oil and gas leases comprising 140.8 acres, more or less, located in the Rebecca Coleman Survey, A-155, Wise County, Texas and described in that certain Designation of Unit dated May 14, 1982 and consisting of portions of the following two (2) leases:

1. Oil and Gas Lease dated October 31, 1963 by and between J.K. Hudson and wife Louise Hudson, et al, lessors, and C.R. Upham, lessee, recorded in Volume 146, Page 611, Lease Records, Wise County, Texas, said lease covering 166.5 acres and said Hudson Unit encompassing 137.8 acres of said Hudson lease; and
2. Oil and Gas Lease dated January 4, 1982 by and between J.D. Read and wife Fae Easley Read, lessors, and Upham Oil & Gas Company, lessee, recorded in Volume 246, Page 883, Lease Records, Wise County, Texas, covering 3 acres said Hudson Unit encompassing 3 acres of said Read lease;

as well as all other leases or tracts of land encompassed in said Hudson Unit as to be determined by the parties upon formal surveying.

**Moody-Atkinson Unit (311 acres)**

Moody-Atkinson Unit in Wise County, Texas consisting of oil and gas leases comprising 311 acres, more or less, located in the Rebecca Coleman Survey, A-155, and described in that certain Redesignation of Moody-Atkinson Gas Unit dated May 1, 1973 and consisting of portions of the following ten (10) leases:

1. Oil and Gas Lease from J. T. Atkinson to Dwight M. Ross, dated January 31, 1946, recorded in Volume 49, Page 89, Lease Records, Wise County, Texas, covering a purported 164 acres, actually, 160.4 acres, said Moody-Atkinson Unit encompassing 160.4 acres of said J. T. Atkinson lease;
2. Oil and Gas Lease from H. A. Hedberg to Upham Gas Company, dated December 29, 1954, recorded in Volume 81, Page 73, Lease Records, Wise County, Texas, covering a purported 164 acres, actually, 160.4 acres, said Moody-Atkinson Unit encompassing 160.4 acres of said H. A. Hedberg lease;

3. Oil and Gas Lease from J. H. Moody to Tennessee Production Company, dated November 21, 1953, recorded in Volume 74, Page 579, Lease Records, Wise County, Texas, covering 50 acres, said Moody-Atkinson Unit encompassing 50 acres of said J. H. Moody lease;

4. Oil and Gas Lease from Mrs. E. L. Jones to M. P. Mask, dated March 6, 1946, recorded in Volume 46, Page 227, Lease Records, Wise County, Texas, covering 50 acres, said Moody-Atkinson Unit encompassing 50 acres of said Mrs. E. L. Jones lease;

5. Oil and Gas Lease from Homer B. Wyatt to C. R. Upham, Jr., dated February 20, 1964, recorded in Volume 148, Page 427, Lease Records, Wise County, Texas, covering 99 acres, said Moody-Atkinson Unit encompassing 50.6 acres of said Homer B. Wyatt lease;

6. Oil and Gas Lease from Vera Sullins to C. R. Upham, Jr., dated February 21, 1964, recorded in Volume 149, Page 469, Lease Records, Wise County, Texas, covering 99 acres, said Moody-Atkinson Unit encompassing 50.6 acres of said Vera Sullins lease;

7. Oil and Gas Lease from Eleanor Walker to C. R. Upham, Jr., dated February 21, 1964, recorded in Volume 150, Page 162, Lease Records, Wise County, Texas, covering 99 acres, said Moody-Atkinson Unit encompassing 50.6 acres of said Eleanor Walker lease;

8. Oil and Gas Lease from Nellie Walker to C. R. Upham, Jr., dated February 21, 1964, recorded in Volume 150, Page 262, Lease Records, Wise County, Texas, covering 99 acres, said Moody-Atkinson Unit encompassing 50.6 acres of said Nellie Walker lease;

9. Oil and Gas Lease from Willie Walker to C. R. Upham, Jr., dated February 21, 1964, recorded in Volume 150, Page 349, Lease Records, Wise County, Texas, covering 99 acres, said Moody-Atkinson Unit encompassing 50.6 acres of said Willie Walker lease; and

10. Oil and Gas Lease from O. B. Walker to C. R. Upham, Jr., dated February 21, 1964, recorded in Volume 153, Page 269, Lease Records, Wise County, Texas, covering 99 acres, said Moody-Atkinson Unit encompassing 50.6 acres of said Nellie Walker lease;

as well as all other leases or tracts of land encompassed in said Moody-Atkinson Unit as to be determined by the parties upon formal surveying.

**Turner "A" Unit (152.5 acres)**

The Turner "A" Unit in Wise County, Texas consisting of one oil and gas lease covering 152.5 acres, more or less, out of the James R. Watts Survey, Abstract No. 892, Wise County, Texas, and being more particularly described in the Oil and Gas Lease dated December 17, 1947, from Frank Turner and wife, Belle Turner, Lessors, to F.C. Blagg, Lessee, recorded at Volume 51, Page 472, Lease Records, Wise County, Texas, as well as any other leases or lands within the Turner "A" Lease as to be determined by the parties upon a formal survey.

**Earl Kelley Unit (352 acres)**

The Earl Kelley Unit in Wise County, Texas consisting of oil and gas leases comprising 352 acres, more or less, out of the Rebecca Coleman Survey, Abstract No. 155, Wise County, Texas, and being more particularly described in the Designation of Earl Kelley Gas Unit executed February 11, 1965 and recorded at Volume 158, Page 533, Lease Records, Wise County, Texas. Said Unit encompassing the 99.86 acres described in the Lease dated May 27, 1964, from Earl Kelley and wife, Velma Kelley, Lessors, to C.R. Upham, Jr., Lessee, recorded at Volume 151, Page 571, Lease Records, Wise County, Texas; 106.6 acres described in the Lease dated April 24, 1963 from C.J. Waters, Lessor, to Mitchell & Mitchell Properties, Inc., Lessee, recorded at Volume 143, Page 181, Lease Records, Wise County, Texas; the West 110.7 acres of the 462.7 acres described in the Lease dated February 9, 1946 from Frank Turner, et al, Lessors, to Dwight M. Ross, Lessee, recorded at Volume 49, Page 65, Lease Records, Wise County, Texas; and 34.84 acres of the 99 acres described in the Lease dated February 21, 1964 from Eleanor Walker, et al, Lessors, to C.R. Upham, Jr., Lessee, recorded at Volume 150, Page 162, Lease Records, Wise County, Texas, as well as any other leases or lands within the Earl Kelley Unit as to be determined by the parties upon a formal survey.

**Beeson Unit (332.5 acres)**

The Beeson Unit in Wise County, Texas consisting of oil and gas lease comprising 332.5 acres, more or less, out of the John N. Barnhill Survey, Abstract No. 35, Wise County, Texas, and being more particularly described in the Designation of Beeson Gas Unit executed March 31,

1958 and recorded at Volume 106, Page 573, Lease Records, Wise County, Texas. Said Unit encompassing the 113 acres described in the Lease dated April 20, 1950 from Mrs. J.L. (Maud) Beeson, et al, Lessors, to Otis Meek, Lessee, recorded at Volume 64, Page 51, Lease Records, Wise County Texas; and the 219.5 acres described in the Lease dated December 11, 1947 from Emmett Beeson and wife, Ester Beeson, Lessors, to E.W. Ward, Sr., Lessee, recorded at Volume 49, Page 467, Lease Records, Wise County, as well as any other leases or lands within the Beeson Gas Unit as to be determined by the parties upon a formal survey.

### Turner Unit (346.3 acres)

Turner Unit in Wise County, Texas consisting of oil and gas lease comprising 346.3 acres, more or less, out of the R. Coleman Survey, A-155, being a part of the 457 acre lease executed by Frank Turner, et al, Lessors, to Dwight M. Ross, Lessee, dated February 9, 1946, recorded at Volume 49, Page 65, Lease Records, Wise County, Texas as well as all other leases or tracts of land encompassed in said Turner Unit as to be determined by the parties upon formal surveying. The 110.7 acre portion of the lease which is excluded from the Turner Unit is described in the Pooling Agreement recorded at Volume 164, Page 283, Deed Records, Wise County, Texas.

### Reddell "A" Unit (320 acres)

The Reddell "A" Unit in Wise County, Texas consisting of oil and gas leases comprising 320 acres, more or less, out of the Asa Hill Survey, A-364; C.C. Colley Survey, A-205; J. Couch Survey, A-227; and R. Coleman Survey, A-155; further described in the Redesignation of Reddell "A" Gas Unit executed May 1, 1973 and recorded at Volume 190, Page 237, of the lease records of Wise County, Texas. Said unit encompassing

(1)   The entire fifty acres of the lease from Edgar Reddell and wife, Lessors, to M.P. Mask, Lessee, dated July 27, 1946, recorded in Volume 47, Page 177, Lease Records, Wise County, Texas;

(2)   The entire fifty acres in the lease from E.T. Reddell and wife, Lessors, to Dwight Ross, Lessee, dated February 5, 1946 recorded in Volume 48, Page 445, Lease Records, Wise County, Texas;

(3)   The entire forty-eight acres in the lease from E.T. Reddell and wife, Lessors, to Upham Gas Company, dated December 7, 1954, recorded in Volume 81, Page 47, Lease Records, Wise County, Texas;

(4)   The entire ninety-three acres, later shown to be ninety-six and 2/10ths acres in the lease from W.C. Davis, et al, Lessors, to Dwight M. Ross, Lessee, dated January 30, 1946, recorded in Volume 49, Page 103, Lease Records, Wise County, Texas;

(5)   The entire ninety-three acres, later shown to be ninety-six and 2/10ths acres in the lease from R.C. Johnson, et al, Lessors, to Dwight Ross, Lessee, dated January 30, 1946, recorded in Volume 48, Page 460, Lease Records, Wise County, Texas;

(6)   The entire ninety-three acres, later shown to be ninety-six and 2/10ths acres in the lease from E.L. Johnston, et al, Lessors, to Dwight Ross, dated March 1, 1946, recorded in Volume 48, Page 464, Lease Records, Wise County, Texas;

(7)   Twenty-eight and 7/10ths acres of the one hundred sixty-six acre lease in the lease from J.K. Hudson, et al, Lessors, to C.R. Upham, Jr., Lessee, dated October 31, 1963, recorded in Volume 146, Page 611, Lease Records, Wise County, Texas;

(8)   Twenty-eight and 7/10ths acres of the one hundred sixty-six acre lease in the ratification from Ollie Hudson, et al, dated December 3, 1963, recorded at Volume 148, Page 181, Lease Records, Wise County, Texas;

(9)   Twenty-eight and 7/10ths acres of the one hundred sixty-six acre lease in the ratification from Bobbie Jean Caldwell, et al, dated January 22, 1964, recorded at Volume 148, Page 193, Lease Records, Wise County, Texas;

(10)  The entire called forty acre lease, later platted to be actually fifty and 3/100ths acres in the lease from J.M. Gibbon, Lessor, to C.R. Upham, Jr., Lessee, dated May 26, 1964, recorded at Volume 151, Page 262, Lease Records, Wise County, Texas;

(11)  The entire called forty acre lease, later platted to be actually fifty and 3/100ths acres in the lease from K.L. Buckner, Jr., Lessor, to C.R. Upham, Jr., Lessee, dated May 8, 1964, recorded in Volume 151, page 424, Lease Records, Wise County, Texas;

(12)  The entire called forty acre lease, later platted to be actually fifty and 3/100ths acres in the lease from John Muth, Lessor, to C.R. Upham, Jr., Lessee, dated May 11, 1964, recorded in Volume 151, Page 394, Lease Records, Wise County, Texas;

(13)    The entire called forty acre lease, later platted to be actually fifty and 3/100ths acres in the lease from Marilyn Parrott, Lessor, to C.R. Upham, Jr., Lessee, dated May 11, 1964, recorded in Volume 151, Page 396, Lease Records, Wise County, Texas;

(14)    The entire called forty acre lease, later platted to be actually fifty and 3/100ths acres in the lease from Emma LaRue Renshaw, et al, Lessors, to C.R. Upham, Jr., Lessee, dated May 8, 1964, recorded in Volume 151, Page 406, Lease Records, Wise County, Texas;

(15)    The entire called forty acre lease, later platted to be actually fifty and 3/100ths acres in the lease from John Nehrmeyer, as Lessor, to C.R. Upham, Jr., Lessee, dated May 8, 1964, recorded in Volume 151, Page 398, Lease Records, Wise County, Texas;

(16)    The entire called forty acre lease, later platted to be actually fifty and 3/100ths acres in the lease from Park Springs Oil Company, Lessor, to C.R. Upham, Jr., Lessee, dated May 8, 1964, recorded in Volume 151, Page 401, Lease Records, Wise County, Texas;

(17)    The entire called forty acre lease, later platted to be actually fifty and 3/100ths acres in the lease from Marian Irvine Macbean, et al, Lessors, to C.R. Upham, Jr., Lessee, dated May 8, 1964, recorded in Volume 151, Page 401, Lease Records, Wise County, Texas;

(18)    The entire called forty acre lease, later platted to be actually fifty and 3/100ths acres in the lease from Claude Alexander and Billy Boyd, as Independent Executors of the Estate of W.R. Alexander, Deceased, Lessors, to C.R. Upham, Jr., Lessee, dated May 26, 1964, recorded in Volume 151, Page 258, Lease Records, Wise County, Texas.

as well as all other leases or tracts of land encompassed in said Reddell "A" Unit as to be determined by the parties upon formal surveying.

## Whatley Unit (304.8 acres)

The Whatley Unit in Wise County, Texas consisting of oil and gas leases comprising 304.8 acres, more or less, out of the C.C. Colley Survey, Abstract No. 205 and the Asa Hill Survey, Abstract No. 364, as further described in the Unit Designation recorded at Volume 90, Page 264, and encompassing leases from John P. Whatley et al to Dwight Ross, covering land called 117.5 acres, recorded at Volume 49, Page 59; Samuel T. Busey et ux to Dwight M. Ross, called 117.5 acres, recorded at Volume 48, Page 465; E.G.F. Coursey et al to Dwight M. Ross, called 40 acres, recorded at Volume 49, Page 99; L.M. Hyder to Dwight M. Ross, called 40 acres, recorded at Volume 48, Page 457; Mary Coursey et al to Dwight M. Ross, called 60.5 acres, recorded at Volume 89, Page 578; and Holman Jordan to Dwight M. Ross, called 121 acres, recorded at Volume 48, Page 449, Real Records, Wise County, Texas; as well as other leases or tracts of land encompassed in said Whatley Unit as to be determined by the parties upon formal survey.

## Simpson Unit (284 acres)

The Simpson Unit in Wise County, Texas consisting of oil and gas leases comprising 284 acres, more or less, out of the Asa Hill Survey, Abstract No. 364, as further described in the Lease from Ida Simpson, individually and as Independent Executrix of the Estate of Wm. Simpson to Dwight M. Ross, called 284 acres, recorded at Volume 48, Page 447, Real Records, Wise County, Texas; as well as other leases or tracts of land encompassed in said Simpson Unit as to be determined by the parties upon formal survey.

## Jordan-Smith Unit (337.8 acres)

The Jordan-Smith Unit in Wise County, Texas consisting of oil and gas leases comprising 337.8 acres, more or less, out of the Jessie Couch Survey, Abstract No. 227 and the C.C. Colley Survey, Abstract No. 205, as further described in the Unit Designation recorded at Volume 90, Page 268, and encompassing leases from C.R. Smith et ux to Dwight M. Ross, called 60 acres, recorded at Volume 49, Page 135; Jack Jacob Blanton et al to Dwight M. Ross, called 60 acres, recorded at Volume 49, Page 57; Carl Culwell et al to Dwight M. Ross, called 60 acres, recorded at Volume 49, Page 55; R.S. Lowe to Dwight M. Ross, called 60 acres, recorded at Volume 48, Page 453; F.H. Flanagan to Dwight M. Ross, called 60 acres, recorded at Volume 48, Page 451; and Holman Jordan to Dwight M. Ross, called 300 acres, recorded at Volume 93, Real Records, Wise County, Texas; as well as other leases or tracts of land encompassed in said Jordan-Smith Unit as to be determined by the parties upon formal survey.

**EXHIBIT B**

REDDELL, E.T. "A" WELL #3
API #42-497-34775
WISE COUNTY, TEXAS

# EXHIBIT "B" TO ASSIGNMENT OF TEXAS ENERGY MANAGEMENT CONTRACT

## ARUBA-NEXTERA ASSIGNMENT

NOTICE OF CONFIDENTIALLITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENCE NUMBER.

STATE OF TEXAS          §
                        §
COUNTY OF WISE          §

### PARTIAL ASSIGNMENT OF OIL AND GAS LEASES

For a valuable consideration received, the receipt and sufficiency of which is hereby acknowledged, *Aruba Petroleum, Inc.,* ("Assignor"), whose mailing address is, 555 Republic Drive, Suite 505, Dallas, Texas 75074, does hereby assign, sell and transfer to *NextEra Energy Gas Producing, L.L.C.* ("Assignee"), whose mailing address is 1000 Louisiana Street, Suite 5550, Houston, Texas 77002, an undivided 96.75% of all of Assignor's right, title and interest in and to the oil and gas leases ("Leases") described or referred to on Exhibit "A" attached hereto, along with the non-exclusive right to utilize and occupy the surface lands that cover the Leases, including all rights of way, rights of ingress and egress, road pipeline and other easement rights, and any other rights, titles, interests, permits or privileges, that relate directly to or are used in connection with such leasehold rights, titles and interests. It being the intent of the parties hereto that Assignee is to receive its pro rata share of a seventy five percent (75.0%) net revenue interest ("NRI") in and to the Leases, except that Assignee shall receive its pro rata share of a 0.7408982 NRI on the Whatley Lease and its pro rata share of a 0.7109375 NRI on the Simpson and Jordan-Smith Leases.

This Assignment of Oil and Gas Leases ("Assignment") and the interest assigned and conveyed in and to the Leases is limited in depths from the top of the Barnett Shale formation to the base of the Barnett Shale formation (the "Assigned Formation").

Assignor further EXCEPTS from this Assignment, (i) any formations above the top of the Barnett Shale formation and below the base of the Barnett Shale formation, and (ii) the wells described on Exhibit "B" attached and made a part hereof (the "Retained Wells") and a twenty (20) acre tract in the form of a square surrounding each of the Retained Wells, with each such tract being positioned so that the surface location of each such Retained Well is in the center of each such tract (each, a "Retained Tract"), including the portion of such Retained Wells and Retained Tracts that are completed in the Assigned Formation.

This Assignment is subject to the terms and conditions of that certain Definitive Agreement dated as of January 20, 2012 between Assignor and Upham Producing, L.P., covering the Leases.

By accepting this Assignment, Assignee hereby agrees as of the date hereof, to the extent of the leasehold interest in and to the depths conveyed and assigned herein, to assume, perform and comply with all of the provisions and obligations (express or implied) that are attributable to the Leases, including, but not limited to, all of the terms and conditions of all applicable and valid agreements, contracts and instruments, lease agreements, pooling agreements, communitization agreements and easements and rights-of-way; all existing lease burdens (including, but not limited to, royalties, overriding royalties, production payments, net profits interests, carried working interests or similar burdens); all duties imposed by governmental law, rule or regulation, including the obligations to properly and timely plug and abandon all wells hereafter drilled on the lands covered by the Leases by Assignee, its successors or assigns; to properly and timely remove all buildings, equipment and materials from the lands covered by the Leases that are placed upon the Leases by Assignee upon cessation of use thereof to the extent required by the Leases or other applicable contracts; and to properly and timely restore the surface of the lands covered by the Leases to the extent required by the Leases or other applicable contracts.

Assignor warrants title to the Leases by, through and under Assignor and its affiliates, but not otherwise. Other than the warranty set forth in the preceding sentence, this Assignment is made without warranty of title, either express or implied.

The provisions of this Assignment are for the benefit of and are binding upon Assignor, Assignee, and their respective heirs, personal representatives, successors, and assigns.

ASSIGNOR:

Aruba Petroleum, Inc.

_____
James Poston, President

STATE OF TEXAS          §
                        §
COUNTY OF COLLIN        §

SWORN TO AND SUBSCRIBED before me on this the 25th day of January, 2012, by James L. Poston, in the capacity stated above.

TERECIA MARTIN
Notary Public, State of Texas
My Commission Expires
September 04, 2012

_____
Notary Public, State of Texas

ASSIGNEE:

NextEra Energy Gas Producing, L.L.C.

_____
Lawrence A. Wall, Jr., President

LEGAL
PH

STATE OF TEXAS          §
                        §
COUNTY OF Harris        §

SWORN TO AND SUBSCRIBED before me on this the 24 day of Jan., 2012, by Lawrence A. Wall, Jr., in the capacity stated above.

_____
Notary Public, State of Texas

CHERISE CHRISTINE AGUILAR
Notary Public, State of Texas
My Commission Expires
June 05, 2013

Exhibit "A"

Read Unit (352 acres)

The Read Unit in Wise County, Texas, consisting of oil and gas leases comprising 352 acres out of the Van Zandt County School Land Block, A-1182 and the C. Frazier Survey, A-297 and described in that certain Designation of Read Gas Unit dated May 18, 1955 and consisting of portions of the following six (6) leases:
1. Oil and Gas Lease from H. D. Read and wife to Upham Gas Company, dated February 9, 1955, recorded at Volume 81, Page 487, Lease Records, Wise County, Texas, said lease covering 97 acres and said Read Unit encompassing 93.2 acres of said H.D. Read lease;
2. Oil and Gas Lease from Ethel Randal Read, et al dated April 15, 1953 recorded in Volume 73, Page 213, Lease Records, Wise County, Texas, said lease covering 97 acres and said Read Unit encompassing 88.7 acres of said Ethel Randal Read lease;
3. Oil and Gas Lease from T. P. Read dated April 15, 1953 recorded in Volume 73, Page 207, Lease Records, Wise County, Texas, said lease covering 97 acres and said Read Unit encompassing 34 acres of said T. P. Read lease;
4. Oil and Gas Lease from Carl Read dated April 14, 1953 recorded in Volume 73, Page 203, Lease Records, Wise County, Texas, said lease covering 97 acres and said Read Unit encompassing 37.6 acres of said Carl Read lease;
5. Oil and Gas Lease from Sam M. Edwards dated July 6, 1953 recorded in Volume 75, Page 87, Lease Records, Wise County, Texas, said lease covering 97 acres and said Read Unit encompassing 73 acres of said Sam M. Edwards lease; and
6. Oil and Gas Lease from Ruth Cole dated April 14, 1953 recorded in Volume 73, Page 221, Lease Records, Wise County, Texas, said lease covering 97 acres and said Read Unit encompassing 25.9 acres of said Ruth Cole lease;

as well as all other leases or tracts of land encompassed in said Read Unit as to be determined by the parties upon formal surveying.

Hudson Unit (140.8 acres)

Hudson Unit in Wise County, Texas consisting of oil and gas leases comprising 140.8 acres, more or less, located in the Rebecca Coleman Survey, A-155, Wise County, Texas and described in that certain Designation of Unit dated May 14, 1982 and consisting of portions of the following two (2) leases:
1. Oil and Gas Lease dated October 31, 1963 by and between J.K. Hudson and wife Louise Hudson, et al, lessors, and C.R. Upham, lessee, recorded in Volume 146, Page 611, Lease Records, Wise County, Texas, said lease covering 166.5 acres and said Hudson Unit encompassing 137.8 acres of said Hudson lease; and
2. Oil and Gas Lease dated January 4, 1982 by and between J.D. Read and wife Fae Easley Read, lessors, and Upham Oil & Gas Company, lessee, recorded in Volume 246, Page 883, Lease Records, Wise County, Texas, covering 3 acres said Hudson Unit encompassing 3 acres of said Read lease;

as well as all other leases or tracts of land encompassed in said Hudson Unit as to be determined by the parties upon formal surveying.

Moody-Atkinson Unit (311 acres)

Moody-Atkinson Unit in Wise County, Texas consisting of oil and gas leases comprising 311 acres, more or less, located in the Rebecca Coleman Survey, A-155, and described in that certain Redesignation of Moody-Atkinson Gas Unit dated May 1, 1973 and consisting of portions of the following ten (10) leases:
1. Oil and Gas Lease from J. T. Atkinson to Dwight M. Ross, dated January 31, 1946, recorded in Volume 49, Page 89, Lease Records, Wise County, Texas, covering a purported 164 acres, actually, 160.4 acres, said Moody-Atkinson Unit encompassing 160.4 acres of said J. T. Atkinson lease;
2. Oil and Gas Lease from H. A. Hedberg to Upham Gas Company, dated December 29, 1954, recorded in Volume 81, Page 73, Lease Records, Wise County, Texas, covering a

purported 164 acres, actually, 160.4 acres, said Moody-Atkinson Unit encompassing 160.4 acres of said H. A. Hedberg lease;

3. Oil and Gas Lease from J. H. Moody to Tennessee Production Company, dated November 21, 1953, recorded in Volume 74, Page 579, Lease Records, Wise County, Texas, covering 50 acres, said Moody-Atkinson Unit encompassing 50 acres of said J. H. Moody lease;

4. Oil and Gas Lease from Mrs. E. L. Jones to M. P. Mask, dated March 6, 1946, recorded in Volume 46, Page 227, Lease Records, Wise County, Texas, covering 50 acres, said Moody-Atkinson Unit encompassing 50 acres of said Mrs. E. L. Jones lease;

5. Oil and Gas Lease from Homer B. Wyatt to C. R. Upham, Jr., dated February 20, 1964, recorded in Volume 148, Page 427, Lease Records, Wise County, Texas, covering 99 acres, said Moody-Atkinson Unit encompassing 50.6 acres of said Homer B. Wyatt lease;

6. Oil and Gas Lease from Vera Sullins to C. R. Upham, Jr., dated February 21, 1964, recorded in Volume 149, Page 469, Lease Records, Wise County, Texas, covering 99 acres, said Moody-Atkinson Unit encompassing 50.6 acres of said Vera Sullins lease;

7. Oil and Gas Lease from Eleanor Walker to C. R. Upham, Jr., dated February 21, 1964, recorded in Volume 150, Page 162, Lease Records, Wise County, Texas, covering 99 acres, said Moody-Atkinson Unit encompassing 50.6 acres of said Eleanor Walker lease;

8. Oil and Gas Lease from Nellie Walker to C. R. Upham, Jr., dated February 21, 1964, recorded in Volume 150, Page 262, Lease Records, Wise County, Texas, covering 99 acres, said Moody-Atkinson Unit encompassing 50.6 acres of said Nellie Walker lease;

9. Oil and Gas Lease from Willie Walker to C. R. Upham, Jr., dated February 21, 1964, recorded in Volume 150, Page 349, Lease Records, Wise County, Texas, covering 99 acres, said Moody-Atkinson Unit encompassing 50.6 acres of said Willie Walker lease; and

10. Oil and Gas Lease from O. B. Walker to C. R. Upham, Jr., dated February 21, 1964, recorded in Volume 153, Page 269, Lease Records, Wise County, Texas, covering 99 acres, said Moody-Atkinson Unit encompassing 50.6 acres of said Nellie Walker lease;

as well as all other leases or tracts of land encompassed in said Moody-Atkinson Unit as to be determined by the parties upon formal surveying.

Turner "A" Unit (152.5 acres)

The Turner "A" Unit in Wise County, Texas consisting of one oil and gas lease covering 152.5 acres, more or less, out of the James R. Watts Survey, Abstract No. 892, Wise County, Texas, and being more particularly described in the Oil and Gas Lease dated December 17, 1947, from Frank Turner and wife, Belle Turner, Lessors, to F.C. Blagg, Lessee, recorded at Volume 51, Page 472, Lease Records, Wise County, Texas, as well as any other leases or lands within the Turner "A" Lease as to be determined by the parties upon a formal survey.

Earl Kelley Unit (352 acres)

The Earl Kelley Unit in Wise County, Texas consisting of oil and gas leases comprising 352 acres, more or less, out of the Rebecca Coleman Survey, Abstract No. 155, Wise County, Texas, and being more particularly described in the Designation of Earl Kelley Gas Unit executed February 11, 1965 and recorded at Volume 158, Page 533, Lease Records, Wise County, Texas. Said Unit encompassing the 99.86 acres described in the Lease dated May 27, 1964, from Earl Kelley and wife, Velma Kelley, Lessors, to C.R. Upham, Jr., Lessee, recorded at Volume 151, Page 571, Lease Records, Wise County, Texas; 106.6 acres described in the Lease dated April 24, 1963 from C.J. Waters, Lessor, to Mitchell & Mitchell Properties, Inc., Lessee, recorded at Volume 143, Page 181, Lease Records, Wise County, Texas; the West 110.7 acres of the 462.7 acres described in the Lease dated February 9, 1946 from Frank Turner, et al, Lessors, to Dwight M. Ross, Lessee, recorded at Volume 49, Page 65, Lease Records, Wise County, Texas; and 34.84 acres of the 99 acres described in the Lease dated February 21, 1964 from Eleanor Walker, et al, Lessors, to C.R. Upham, Jr., Lessee, recorded at Volume 150, Page 162, Lease Records, Wise County, Texas, as well as any other leases or lands within the Earl Kelley Unit as to be determined by the parties upon a formal survey.

### Beeson Unit (332.5 acres)

The Beeson Unit in Wise County, Texas consisting of oil and gas lease comprising 332.5 acres, more or less, out of the John N. Barnhill Survey, Abstract No. 35, Wise County, Texas, and being more particularly described in the Designation of Beeson Gas Unit executed March 31, 1958 and recorded at Volume 106, Page 573, Lease Records, Wise County. Said Unit encompassing the 113 acres described in the Lease dated April 20, 1950 from Mrs. J.L. (Maud) Beeson, et al, Lessors, to Otis Meek, Lessee, recorded at Volume 64, Page 51, Lease Records, Wise County Texas; and the 219.5 acres described in the Lease dated December 11, 1947 from Emmett Beeson and wife, Ester Beeson, Lessors, to E.W. Ward, Sr., Lessee, recorded at Volume 49, Page 467, Lease Records, Wise County, as well as any other leases or lands within the Beeson Gas Unit as to be determined by the parties upon a formal survey.

### Turner Unit (346.3 acres)

Turner Unit in Wise County, Texas consisting of oil and gas lease comprising 346.3 acres, more or less, out of the R. Coleman Survey, A-155, being a part of the 457 acre lease executed by Frank Turner, et al, Lessors, to Dwight M. Ross, Lessee, dated February 9, 1946, recorded at Volume 49, Page 65, Lease Records, Wise County, Texas as well as all other leases or tracts of land encompassed in said Turner Unit as to be determined by the parties upon formal surveying. The 110.7 acre portion of the lease which is excluded from the Turner Unit is described in the Pooling Agreement recorded at Volume 164, Page 283, Deed Records, Wise County, Texas.

### Reddell "A" Unit (320 acres)

The Reddell "A" Unit in Wise County, Texas consisting of oil and gas leases comprising 320 acres, more or less, out of the Asa Hill Survey, A-364; C.C. Colley Survey, A-205; J. Couch Survey, A-227; and R. Coleman Survey, A-155; further described in the Redesignation of Reddell "A" Gas Unit executed May 1, 1973 and recorded at Volume 190, Page 237, of the lease records of Wise County, Texas.   Said unit encompassing

(1) The entire fifty acres of the lease from Edgar Reddell and wife, Lessors, to M.P. Mask, Lessee, dated July 27, 1946, recorded in Volume 47, Page 177, Lease Records, Wise County, Texas;

(2) The entire fifty acres in the lease from E.T. Reddell and wife, Lessors, to Dwight Ross, Lessee, dated February 5, 1946 recorded in Volume 48, Page 445, Lease Records, Wise County, Texas;

(3) The entire forty-eight acres in the lease from E.T. Reddell and wife, Lessors, to Upham Gas Company, dated December 7, 1954, recorded in Volume 81, Page 47, Lease Records, Wise County, Texas;

(4) The entire ninety-three acres, later shown to be ninety-six and 2/10ths acres in the lease from W.C. Davis, et al, Lessors, to Dwight M. Ross, Lessee, dated January 30, 1946, recorded in Volume 49, Page 103, Lease Records, Wise County, Texas;

(5) The entire ninety-three acres, later shown to be ninety-six and 2/10ths acres in the lease from R.C. Johnson, et al, Lessors, to Dwight Ross, Lessee, dated January 30, 1946, recorded in Volume 48, Page 460, Lease Records, Wise County, Texas;

(6) The entire ninety-three acres, later shown to be ninety-six and 2/10ths acres in the lease from E.L. Johnston, et al, Lessors, to Dwight Ross, dated March 1, 1946, recorded in Volume 48, Page 464, Lease Records, Wise County, Texas;

(7) Twenty-eight and 7/10ths acres of the one hundred sixty-six acre lease in the lease from J.K. Hudson, et al, Lessors, to C.R. Upham, Jr., Lessee, dated October 31, 1963, recorded in Volume 146, Page 611, Lease Records, Wise County, Texas;

(8) Twenty-eight and 7/10ths acres of the one hundred sixty-six acre lease in the ratification from Ollie Hudson, et al, dated December 3, 1963, recorded at Volume 148, Page 181, Lease Records, Wise County, Texas;

(9) Twenty-eight and 7/10ths acres of the one hundred sixty-six acre lease in the ratification from Bobbie Jean Caldwell, et al, dated January 22, 1964, recorded at Volume 148, Page 193, Lease Records, Wise County, Texas;

(10) The entire called forty acre lease, later platted to be actually fifty and 3/100ths acres in the lease from J.M. Gibbon, Lessor, to C.R. Upham, Jr., Lessee, dated May 26, 1964, recorded at Volume 151, Page 262, Lease Records, Wise County, Texas;

(11) The entire called forty acre lease, later platted to be actually fifty and 3/100ths acres in the lease from K.L. Buckner, Jr., Lessor, to C.R. Upham, Jr., Lessee, dated May 8, 1964, recorded in Volume 151, page 424, Lease Records, Wise County, Texas;

(12) The entire called forty acre lease, later platted to be actually fifty and 3/100ths acres in the lease from John Muth, Lessor, to C.R. Upham, Jr., Lessee, dated May 11, 1964, recorded in Volume 151, Page 394, Lease Records, Wise County, Texas;

(13) The entire called forty acre lease, later platted to be actually fifty and 3/100ths acres in the lease from Marilyn Parrott, Lessor, to C.R. Upham, Jr., Lessee, dated May 11, 1964, recorded in Volume 151, Page 396, Lease Records, Wise County, Texas;

(14) The entire called forty acre lease, later platted to be actually fifty and 3/100ths acres in the lease from Emma LaRue Renshaw, et al, Lessors, to C.R. Upham, Jr., Lessee, dated May 8, 1964, recorded in Volume 151, Page 406, Lease Records, Wise County, Texas;

(15) The entire called forty acre lease, later platted to be actually fifty and 3/100ths acres in the lease from John Nehrmeyer, as Lessor, to C.R. Upham, Jr., Lessee, dated May 8, 1964, recorded in Volume 151, Page 398, Lease Records, Wise County, Texas;

(16) The entire called forty acre lease, later platted to be actually fifty and 3/100ths acres in the lease from Park Springs Oil Company, Lessor, to C.R. Upham, Jr., Lessee, dated May 8, 1964, recorded in Volume 151, Page 401, Lease Records, Wise County, Texas;

(17) The entire called forty acre lease, later platted to be actually fifty and 3/100ths acres in the lease from Marian Irvine Macbean, et al, Lessors, to C.R. Upham, Jr., Lessee, dated May 8, 1964, recorded in Volume 151, Page 401, Lease Records, Wise County, Texas;

(18) The entire called forty acre lease, later platted to be actually fifty and 3/100ths acres in the lease from Claude Alexander and Billy Boyd, as Independent Executors of the Estate of W.R. Alexander, Deceased, Lessors, to C.R. Upham, Jr., Lessee, dated May 26, 1964, recorded in Volume 151, Page 258, Lease Records, Wise County, Texas.

as well as all other leases or tracts of land encompassed in said Reddell "A" Unit as to be determined by the parties upon formal surveying.

## Whatley Unit (304.8 acres)

The Whatley Unit in Wise County, Texas consisting of oil and gas leases comprising 304.8 acres, more or less, out of the C.C. Colley Survey, Abstract No. 205 and the Asa Hill Survey, Abstract No. 364, as further described in the Unit Designation recorded at Volume 90, Page 264, and encompassing leases from John P. Whatley et al to Dwight Ross, covering land called 117.5 acres, recorded at Volume 49, Page 59; Samuel T. Busey et ux to Dwight M. Ross, called 117.5 acres, recorded at Volume 48, Page 465; E.G.F. Coursey et al to Dwight M. Ross, called 40 acres, recorded at Volume 49, Page 99; L.M. Hyder to Dwight M. Ross, called 40 acres, recorded at Volume 48, Page 457; Mary Coursey et al to Dwight M. Ross, called 60.5 acres, recorded at Volume 89, Page 578; and Holman Jordan to Dwight M. Ross, called 121 acres, recorded at Volume 48, Page 449, Real Records, Wise County, Texas; as well as other leases or tracts of land encompassed in said Whatley Unit as to be determined by the parties upon formal survey.

## Simpson Unit (284 acres)

The Simpson Unit in Wise County, Texas consisting of oil and gas leases comprising 284 acres, more or less, out of the Asa Hill Survey, Abstract No. 364, as further described in the Lease from Ida Simpson, individually and as Independent Executrix of the Estate of Wm. Simpson to Dwight M. Ross, called 284 acres, recorded at Volume 48, Page 447, Real Records, Wise County, Texas; as well as other leases or tracts of land encompassed in said Simpson Unit as to be determined by the parties upon formal survey.

## Jordan-Smith Unit (337.8 acres)

The Jordan-Smith Unit in Wise County, Texas consisting of oil and gas leases comprising 337.8 acres, more or less, out of the Jessie Couch Survey, Abstract No. 227 and the C.C. Colley Survey, Abstract No. 205, as further described in the Unit Designation recorded at Volume 90, Page 268, and encompassing leases from C.R. Smith et ux to Dwight M. Ross, called 60 acres, recorded at Volume 49, Page 135; Jack Jacob Blanton et al to Dwight M. Ross, called 60 acres, recorded at Volume 49, Page 57; Carl Culwell et al to Dwight M. Ross, called 60 acres, recorded at Volume 49, Page 55; R.S. Lowe to Dwight M. Ross, called 60 acres, recorded at Volume 48, Page 453; F.H. Flanagan to Dwight M. Ross, called 60 acres, recorded at Volume 48, Page 451;

and Holman Jordan to Dwight M. Ross, called 300 acres, recorded at Volume 49, Page 93, Real Records, Wise County, Texas; as well as other leases or tracts of land encompassed in said Jordan-Smith Unit as to be determined by the parties upon formal survey.

EXHIBIT B

REDDELL, E.T. "A" WELL #3
API #42-497-34775
WISE COUNTY, TEXAS